[Nos. 25892-1-III; 26017-8-III. Division Three. June 10, 2008.]

THE STATE OF WASHINGTON, *Respondent*, v. ALFRED EARLE BROWN, *Appellant*.

---

64

*David L. Donnan* and *Thomas M. Kummerow* (of *Washington Appellate Project*), and *Jeffrey B. West*, for appellant.

*Ronald S. Zirkle, Prosecuting Attorney*, and *Kenneth L. Ramm, Jr., Deputy*, for respondent.

¶1 Thompson, J.[*] — Alfred E. Brown appeals his conviction for vehicular assault. He asserts that because the State failed to lay the foundation for the admission of his blood test, the blood alcohol evidence should not have been admitted and evidence contained in a manufacturer's certificate of compliance was wrongfully admitted. The State cross-appeals Mr. Brown's sentence. The jury unanimously found Mr. Brown guilty of two alternative means of vehicular assault that carry a seriousness level of 4. It also found him guilty of an alternative means that carries a seriousness level of 3. The State contends the trial court was required to sentence Mr. Brown to the higher seriousness level of 4.

¶2 The admission of Mr. Brown's blood test was proper. Since it is clear the jury found the defendant guilty of

---

[*] Judge Philip J. Thompson is serving as judge pro tempore of the Court of Appeals pursuant to RCW 2.06.150.

committing the crime in all three possible ways, the court should have sentenced Mr. Brown under the higher sentencing range. We remand for resentencing.

## FACTS

¶3 On October 12, 2006, Mr. Brown, driving his friend Steve Chandler home, failed to negotiate a turn in the road and drove his car into a ditch. Mr. Chandler suffered a serious facial laceration.

¶4 Yakima County Deputy Sheriff Chad Peterschick, dispatched to the accident scene, smelled alcohol on Mr. Brown's breath. Mr. Brown admitted he had had too much to drink and stated he knew he was in trouble. Deputy Peterschick arrested Mr. Brown and transported him to Yakima Regional Hospital to have his blood drawn for a blood alcohol test.

¶5 The deputy watched the phlebotomist, Sandy Davenport, draw blood from Mr. Brown. The court found Ms. Davenport to be a qualified person to draw the blood. Ms. Davenport placed the blood sample in vials provided by Deputy Peterschick from a kit that another deputy brought to the hospital. Deputy Peterschick took the vials from Ms. Davenport and repacked them in the Styrofoam container.

¶6 Forensic toxicologist Justin Knoy received Mr. Brown's vials for testing; the vials were sealed with grey stoppers which were made of inert material and were intact. He holds a permit that qualifies him to make blood alcohol examinations. Mr. Knoy tested a sample from one of the vials twice. Over defense objections to a lack of foundation for admissibility, the court admitted the results of the blood tests which showed Mr. Brown had a blood alcohol level of 0.34.

## DISCUSSION

BLOOD EVIDENCE

¶7 In order to obtain a conviction for vehicular assault, the State was required to prove that Mr. Brown

operated or drove a vehicle: (a) in a reckless manner and caused substantial bodily harm to another, or (b) while under the influence of intoxicating liquor as set forth in RCW 46.61.502 and caused substantial bodily harm to another, or (c) with disregard for the safety of others and caused substantial harm to another. RCW 46.61.522(1). There are two ways to prove driving while under the influence of intoxicating liquor under RCW 46.61.502: (1) by showing the defendant's blood alcohol level was at least 0.08 within two hours after driving or (2) by evidence tending to show the defendant was under the influence of alcohol and/or other drugs. *City of Seattle v. Clark-Munoz*, 152 Wn.2d 39, 44, 93 P.3d 141 (2004).

¶8 Mr. Brown contends that the blood test should not have been admitted. A trial court's ruling on the admission of a blood alcohol test result is reviewed for abuse of discretion. *State v. Hultenschmidt*, 125 Wn. App. 259, 264, 102 P.3d 192 (2004); *Clark-Munoz*, 152 Wn.2d at 44. Mr. Brown bears the burden of showing abuse of discretion. *State v. Sponburgh*, 84 Wn.2d 203, 210, 525 P.2d 238 (1974); *State v. Saunders*, 120 Wn. App. 800, 811, 86 P.3d 232 (2004). The trial court abuses its discretion when it admits evidence of a blood test result in the face of insufficient prima facie evidence. *State v. Bosio*, 107 Wn. App. 462, 468, 27 P.3d 636 (2001).

¶9 "Prima facie evidence" is defined under the driving under the influence of an intoxicant statute as "evidence of sufficient circumstances that would support a logical and reasonable inference of the facts sought to be proved."[1] RCW 46.61.506(4)(b). To determine the sufficiency of the evidence of foundational facts, the court must assume the truth of the State's evidence and all reasonable inferences from it in a light most favorable to the State. *Id.*

¶10 In order to admit blood alcohol test results, "the State must present prima facie proof that the test chemicals

---

[1] Subsections (4)(b) and (c) apply to the entire section of RCW 46.61.506, which includes breath tests and blood tests.

and the blood sample are free from any adulteration which could conceivably introduce error to the test results." *State v. Clark*, 62 Wn. App. 263, 270, 814 P.2d 222 (1991). "[A] blood sample analysis is admissible to show intoxication under RCW 46.61.502 only when it is performed according to WAC [Washington Administrative Code] requirements." *Hultenschmidt*, 125 Wn. App. at 265.

¶11 The WAC requires:

Blood samples for alcohol analysis shall be preserved with an anticoagulant and an enzyme poison sufficient in amount to prevent clotting and stabilize the alcohol concentration. Suitable preservatives and anticoagulants include the combination of sodium fluoride and potassium oxalate.

WAC 448-14-020(3)(b).

¶12 The purpose of requiring the use of anticoagulants and enzyme poison in the blood sample is to prevent clotting and/or loss of alcohol concentration in the sample. *Clark*, 62 Wn. App. at 270. Fulfillment of the requirements of WAC 448-14-020(3)(b) is mandatory, notwithstanding the State's ability to establish a prima facie case that the sample was unadulterated. *Bosio*, 107 Wn. App. at 468; *State v. Garrett*, 80 Wn. App. 651, 654, 910 P.2d 552 (1996). Once a prima facie showing is made, it is for the jury to determine the weight to be attached to the evidence. RCW 46.61.506(4)(c); *Hoffman v. Tracy*, 67 Wn.2d 31, 35, 406 P.2d 323 (1965).

¶13 Mr. Brown argues that there is no evidence that the vials contained the requisite chemicals before the blood draw because the phlebotomist did not identify a preservative and stabilizer and no proof was provided by the State that the blood collection kit came from a source at the crime lab.

¶14 Here, relying on her education, the phlebotomist testified that she believed the powdery substance contained in the vials for a typical legal blood draw was "sodium oxalate." Report of Proceedings (RP) at 260. The phlebotomist did not identify a substance approved by the

WAC. She concluded that she would not collect blood for a legal blood alcohol test if the vial did not contain "sodium oxalate." RP at 260-61. As noted, the deputy did not know what substance, if any, was in the vials at the time of Mr. Brown's blood draw. Thus, nobody with firsthand knowledge testified as to what was contained in the vials used for Mr. Brown's blood sample prior to the blood draw. But that is not what the regulation requires.

¶15 The regulation requires only that the blood samples "be preserved with an anticoagulant and an enzyme poison sufficient in amount to prevent clotting and stabilize the alcohol concentration." WAC 448-14-020(3)(b). Further, there is a relaxed standard for foundational facts under the blood alcohol statute in that the court assumes the truth of the State's evidence and all reasonable inferences from it in a light most favorable to the State. RCW 46.61.506(4)(b).

¶16 The toxicologist testified that vials used for the collection of samples for a blood alcohol test are provided by the manufacturer with powdery chemicals in them, which he identified as potassium oxalate and sodium fluoride. He also stated that he read the labels on the vials that contained Mr. Brown's blood, which indicated that the vials contained sodium fluoride and potassium oxalate. The toxicologist also testified that if those chemicals were not present, the blood would be clotted and no alcohol would be detected in the samples. The toxicologist observed in this case that the blood in the samples was not clotted and alcohol was detected in the samples.

¶17 The State therefore provided sufficient evidence, under RCW 46.61.506(4)(b), that the vials contained the WAC-approved substances in sufficient amounts to stabilize and preserve the blood samples.

¶18 Mr. Brown argues that this case is similar to *Bosio* and *Hultenschmidt*. In *Bosio*, both the trooper who arrested Ms. Bosio and the nurse who drew the blood sample testified they saw the anticoagulant white powder in the vials but did not testify regarding the presence of the enzyme poison. *Bosio*, 107 Wn. App. at 467. Ms. Bosio's

conviction was reversed on appeal because the State failed to make a prima facie showing that the blood sample was properly preserved. *Id.* at 468. But in *Bosio,* there was a *complete absence* of evidence concerning the presence of the enzyme poison that is required under WAC 448-14--020(3)(b). *Id.* Similarly, in *Hultenschmidt,* 125 Wn. App. at 266, the toxicologist testified at length about the anti-coagulant but testified that an enzyme poison was not required. Here, the enzyme poison was identified by its appearance, the label, the certificate, and the preserved alcohol content of the samples.

¶19 Mr. Brown also argues that the case relied on by the trial court to allow the evidence, *State v. Wilbur-Bobb,* 134 Wn. App. 627, 141 P.3d 665 (2006), is distinguishable. In *Wilbur-Bobb,* the defense contended the evidence failed to prove sodium fluoride was present in the vials prior to the blood draw. The arresting state trooper testified that the defendant's blood was tested with a blood vial packet, which the trooper retrieved from his patrol car and which originally comes from the state toxicology lab. *Id.* at 631. The trooper testified that the blood vials, which the trooper was required to use, contained a white powder. The toxicologist produced a photograph of the vials, which were clearly labeled to indicate that they contained sodium fluoride. The appellate court concluded there was sufficient evidence presented for the admission of the blood tests. *Id.* at 631-32.

¶20 Mr. Brown argues that because there was no evidence concerning the original source of the blood collection kit used here, there was insufficient prima facie evidence to admit the blood test results.

¶21 Here, Deputy Peterschick testified that he received an evidence kit at the hospital from another deputy who did not testify. Deputy Peterschick described the evidence kit. The phlebotomist testified as to the contents of the typical evidence kit and the procedures she typically followed. The phlebotomist noted no deviation in this case from her typical procedures. This evidence is sufficient to show the kit that the deputy delivered to the hospital was the

standard blood draw kit, rather than one from an unacceptable source. The testimony of the toxicologist who viewed the labels that showed the vials contained the acceptable chemicals is comparable to the photographs in *Wilbur-Bobb.*

¶22 Mr. Brown asserts that the evidence contained in the manufacturer's certificate should not have been admitted. We agree, but it does not affect the sufficiency of the evidence for admission of the blood test.

¶23 Mr. Brown argued below that the certificate was hearsay. He is correct. Hearsay is generally inadmissible. ER 803. " 'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." ER 801(c). Generally, one expert may not relay the opinion of another nontestifying expert without running afoul of the hearsay rule. *See State v. Nation*, 110 Wn. App. 651, 662, 41 P.3d 1204 (2002); *State v. Wicker*, 66 Wn. App. 409, 411-12, 832 P.2d 127 (1992).

¶24 In the burglary trial in *Wicker*, the police fingerprint identification technician testified that latent fingerprints matched the defendant's fingerprints. *Wicker*, 66 Wn. App. at 411. The technician then went further to testify that it was standard procedure that his comparison be "verified" by another senior technician. *Id.* According to the witness, a comparison is verified if the other senior technician agrees with his conclusions. *Id.* The technician ultimately identified another senior technician and testified that she verified his identification in the burglary case, as evidenced by her initials on the fingerprint card. *Id.* The trial court admitted the evidence of the senior technician's verification.

¶25 On appeal, the court held that the placement of the senior technician's initials on the fingerprint card was an out-of-court statement that, when considered with the technician's testimony, amounts to an assertion by the senior technician that the two sets of prints match. *Id.* at 411-12. The court concluded that "the evidence is classic

hearsay, an out-of-court statement offered for the truth of what it asserts." *Id.* at 412.

¶26 The same is true here. In conjunction with the certificate, the toxicologist's testimony showed that the manufacturer's certification officer *agreed* with his conclusion that the chemicals were present in the vials. But according to the toxicologist, the certification was not even needed—the toxicologist testified that if the chemicals were not present, the sample would be clotted and the alcohol would not be detected.

¶27 Mr. Brown also correctly argues that the certificate is not admissible as an exception to the hearsay rule under ER 703 and ER 705.

¶28 ER 703 permits an expert to base his or her expert opinion on facts or data that are not otherwise admissible provided that they are of a type reasonably relied on by experts in the particular field.

¶29 ER 705 grants the trial court discretion to allow an expert to relate hearsay or otherwise inadmissible evidence to the trier of fact to explain the reasons for his or her expert opinion, subject to appropriate limiting instructions.

¶30 Under ER 703, a trial court may admit an expert's testimony that is based on facts or data which are not otherwise admissible, if those facts or data are of the type reasonably relied upon by experts in that field in forming opinions other than for the purposes of litigation. *Nation,* 110 Wn. App. at 662-63; *State v. Ecklund,* 30 Wn. App. 313, 317-18, 633 P.2d 933 (1981).

¶31 In *Nation,* a forensic technician who tested the controlled substances was on vacation and unavailable for trial. *Nation,* 110 Wn. App. at 656. At trial, the State called the forensic technician's supervisor to explain the types of testing the unavailable technician performed and the results of each test. *Id.* The supervisor testified that it is typical in his office to rely on the data of a subordinate technician to reach his own conclusion. *Id.* at 663. This court held that the supervisor failed to establish that

persons in his field outside of his office customarily relied upon the material for purposes other than preparation for litigation. *Id.* The testimony was therefore inadmissible under ER 703. The same is true here.

¶32 The certificate is not necessary because the toxicologist concluded from the label and the sample's appearance that the anticoagulant was used and he also concluded from the test positive for the presence of alcohol that the enzyme poison was used. There is also no testimony that others outside of the crime lab rely upon the certificate for purposes other than preparation for litigation. The toxicologist did not refer to the certificate to assist the jury in understanding his forensic conclusions regarding the evidence he tested. Therefore, his statement was not admissible as an exception to the hearsay rule under ER 703 or ER 705. The trial court erred when it allowed the statement and subsequently refused to strike it from the record.

¶33 The State does not respond to Mr. Brown's ER 703/705 argument. Instead, it relies on ER 1101. It is well established that a trial court is "not bound by the Rules of Evidence" when it determines preliminary questions concerning the admissibility of evidence. ER 104(a); *see also* ER 1101(c)(1), (3). While ER 104(a) and 1101(c)(1) permitted the trial court to rely on the certificate in making its determination as to the admissibility of the blood sample, presentation of the evidence in the certificate should have been limited to the judge's purview for foundational purposes.

¶34 These evidentiary errors, however, do not warrant reversal.

¶35 "It is well established that constitutional errors, including violations of a defendant's rights under the confrontation clause, may be so insignificant as to be harmless." *State v. Guloy*, 104 Wn.2d 412, 425, 705 P.2d 1182 (1985). "A constitutional error is harmless if the appellate court is convinced beyond a reasonable doubt that any reasonable jury would have reached the same result in the absence of the error." *Id.*; *accord Wicker*, 66 Wn. App. at 414;

*Nation,* 110 Wn. App. at 666. Constitutional error is presumed to be prejudicial, and the State bears the burden of proving that the error was harmless. *State v. Stephens,* 93 Wn.2d 186, 190-91, 607 P.2d 304 (1980); *Guloy,* 104 Wn.2d at 425.

¶36 The appellate court uses the "overwhelming untainted evidence" test in its harmless error analysis. *Guloy,* 104 Wn.2d at 426. Under that test, we look only to the untainted evidence to determine whether the untainted evidence is so overwhelming that it "necessarily leads to a finding of guilt." *Id.; see also State v. Davis,* 154 Wn.2d 291, 305, 111 P.3d 844 (2005), *aff'd,* 547 U.S. 813, 126 S. Ct. 2266, 165 L. Ed. 2d 224 (2006). Here, Mr. Brown has failed to show that, had the court properly denied admission of the toxicologist's testimony regarding the manufacturer's certificate, the outcome of the trial would have been different.

¶37 As stated, there was other sufficient evidence proving that the vials contained the stabilizer and preservative. The labels on the vials provided evidence that they contained the chemicals and the toxicologist testified that the samples would have been clotted and would contain no alcohol in the absence of the chemicals. Therefore, the admissible blood evidence was sufficient to support the jury's finding that Mr. Brown's blood alcohol level was at least 0.08 within two hours after driving.

¶38 We therefore find no reversible error.

¶39 Mr. Brown raises two issues in his statement of additional grounds.

¶40 Mr. Brown first asserts that because Mr. Chandler's facial injury left a permanent scar, rather than a temporary deformity, the evidence concerning the crime is insufficient. Mr. Brown misconstrues the use of "temporary" in the WPIC.[2] The temporary nature of the injury is the minimum threshold for vehicular assault. Even if the injury is temporary, it can support a conviction. *See State v.*

---

[2] 11 Washington Practice: Washington Pattern Jury Instructions: Criminal (2d ed. 1994).

*Suleiman*, 158 Wn.2d 280, 294 n.5, 143 P.3d 795 (2006) (holding that, under proper circumstances, the severity of the injury can be the basis for an exceptional sentence). Moreover, the officer testified that when he approached the car Mr. Chandler was "hunched over in the passenger seat, attempting to hold his face together." RP at 209. This was a temporary disfigurement now evidenced by a scar.

¶41 Next, Mr. Brown takes issue with the charge of vehicular assault. He argues that there was no assault in the common law sense of the word. It is only because the term "assault" is not defined in the criminal code that we turn to the common law for its definition. *State v. Wilson*, 125 Wn.2d 212, 217, 883 P.2d 320 (1994). From the common law, we recognize three types of assault: attempted battery, actual battery, and apprehension of harm. *State v. Bland*, 71 Wn. App. 345, 353, 860 P.2d 1046 (1993). We need not resort to the common law definitions of the crime in the code on vehicular assault because the statute defines the crime. RCW 46.61.522.

SENTENCING

¶42 As previously mentioned, vehicular assault can be committed under three alternative means. RCW 46.61-.522(1). The jury here found Mr. Brown guilty of all three alternative means.

¶43 The alternative means of driving while under the influence and reckless driving have a seriousness level of 4. RCW 9.94A.515. Based on Mr. Brown's offender score of 9, this meant a standard range of 63-84 months. RCW 9.94A.510. Disregard for the safety of others has a seriousness level of 3 with a standard range here of 51-68 months. RCW 9.94A.510, .515. The trial court here used the lower seriousness level to sentence Mr. Brown to a high-end sentence of 68 months. This sentence was within the standard ranges for a sentence under both seriousness levels.

¶44 Generally, a party cannot appeal a standard-range sentence. RCW 9.94A.585(1); *State v. Williams*,

149 Wn.2d 143, 146, 65 P.3d 1214 (2003). "This precept arises from the notion that, so long as the sentence falls within the proper presumptive sentencing ranges set by the legislature, there can be no abuse of discretion as a matter of law as to the sentence's length." *Williams*, 149 Wn.2d at 146-47 (citing *State v. Ammons*, 105 Wn.2d 175, 183, 713 P.2d 719, 718 P.2d 796 (1986)).

¶45 Under RAP 2.2(b)(6), however, the State may appeal a sentence in a criminal case that it believes involves a miscalculation of the standard range. Moreover, the State's right to appeal an alleged miscalculation of standard sentencing ranges is not affected by the imposition of a sentence that would have been proper under either of the two alternative ranges. *State v. Rodriguez*, 61 Wn. App. 812, 812 P.2d 868 (1991). This is what the State contends here.

¶46 The State asserts that because the jury unanimously found Mr. Brown guilty of the two alternatives with a seriousness level of 4, as well as the one alternative with a seriousness level of 3, the trial court was required to sentence Mr. Brown with the higher seriousness level and the corresponding sentencing range. This is an issue of first impression.

¶47 The State relies on two cases it argues impliedly support its position—*State v. Thanh Dong Tang*, 77 Wn. App. 644, 893 P.2d 646 (1995) and *State v. Maurice*, 79 Wn. App. 544, 903 P.2d 514 (1995). *Tang* holds that when a criminal defendant is charged with alternative means of committing a crime that have different seriousness levels and the jury returns a general verdict of guilty, a trial court must use the lowest seriousness level in sentencing the defendant absent a special interrogatory indicating the jury unanimously finds that the defendant committed the offense by a means with a higher seriousness level. *Tang*, 77 Wn. App. at 650-51. In *Tang* the jury decided by special interrogatory that it had not unanimously found the defendant guilty of the vehicular homicide by driving while intoxicated. It was therefore proper, the appellate court held, to sentence the defendant using the lower seriousness

level assigned to the disregard for the safety of others means of committing the crime. *Id.*

¶48 The State also relies on *Maurice*, 79 Wn. App. 544, another unanimity case. In *Maurice*, the defendant was charged under all three means of committing vehicular homicide, driving while under the influence, disregard for the safety of others, and reckless driving. There, this court held:

> The vehicular homicide statute provides three alternate means of committing the same crime and does not define separate crimes. Therefore, the jury must be unanimous on the issue of guilt, but it need not be unanimous on the way the crime was committed as long as the State presents substantial evidence supporting each charged alternative.
>
> The court interjected the unanimity requirement for sentencing purposes only. Because the first two alternatives carry a stiffer penalty than the third, the court must determine the conviction rests squarely on one of the first two alternatives before it can impose the longer sentence. A lighter sentence is required whenever the jury unanimously finds the offense was committed by the third alternative or is split between either of the first two alternatives and the third, as may have happened here.

*Id.* at 549-50 (footnote and citations omitted).

¶49 Here, the jury unanimously decided that Mr. Brown was culpable of committing each alternative. In *Maurice*, the defendant did not challenge the sufficiency of the evidence to support each alternative. *Id.* at 550 n.3. Mr. Brown did not do so here, either.

¶50 The State argues that the sentencing court must impose a penalty from the higher standard range because to do otherwise would disregard the jury's finding on the higher crime. We agree.

¶51 RCW 9.94A.505 relevantly provides:

> (1) When a person is convicted of a felony, the court shall impose punishment as provided in this chapter.
>
> (2)(a) The court shall impose a sentence as provided in the following sections and as applicable in the case:

(i) Unless another term of confinement applies, the court shall impose a sentence within the standard sentence range established in RCW 9.94A.510 or 9.94A.517.

¶52 The higher sentence was applicable.

¶53 When the trial court decided to instruct the jury on all three alternate means, it anticipated the sentencing issue and stated that the rule of lenity would apply to require a lower sentence. The policy underlying the rule of lenity is to "place the burden squarely on the Legislature to clearly and unequivocally warn people of the actions that expose them to liability for penalties and what those penalties are." *State v. Jackson*, 61 Wn. App. 86, 93-94, 809 P.2d 221 (1991) (citing *State v. Knowles*, 46 Wn. App. 426, 432, 730 P.2d 738 (1986)).

¶54 The trial court also interpreted *Maurice* to mean that when the jury finds the defendant acted in a manner consistent with all of the alternatives, which has been found by the statute to constitute more and less relatively culpable means, then the lesser sentence applies.[3] *See also* 11A WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 90.03 note on use (2d ed. Supp. 2005) ("When alternatives are presented to a jury which carry different levels of punishment for sentencing purposes, 'the court must determine the conviction rests squarely on [an alternative carrying a stiffer penalty] before it can impose the longer sentence. A lighter sentence is required whenever the jury unanimously finds the offense was committed by the [alternative with a lesser penalty] or is split between [the greater and lesser alternatives].' State v. Maurice, 79

---

[3] The court stated, "The jury interrogatory includes an inquiry as to unanimity. When alternatives are presented to the jury which carry different levels of punishment for sentencing purposes, the court must determine the conviction rests squarely on an alternative carrying a stiffer penalty before it can impose the longer sentence. A lighter sentence is required whenever the jury unanimously finds the offense was committed by the alternative with the lesser penalty.

"And here is the kicker in my mind, or is split between the greater and lesser alternatives. So I certainly read that to mean that if they bring it back on this interrogatory and sub C is included in there anywhere . . . [h]e gets the lesser." RP at 386-87.

Wn. App. 544, 550, 903 P.2d 514, 517 (1995)." (alterations in original)).

¶55 Because there was no confusion as to any of the means by which the jury found Mr. Brown guilty, the rule of lenity does not apply and the trial court was required to sentence Mr. Brown under the higher sentencing range.

¶56 Generally, a sentencing court is afforded wide discretion in imposing a sentence within statutory limits. *State v. Herzog*, 112 Wn.2d 419, 424, 771 P.2d 739 (1989). A court abuses its discretion when it bases its decision on untenable grounds or reasons, or if it relies on an erroneous view of the law. *State v. Powell*, 126 Wn.2d 244, 258, 893 P.2d 615 (1995); *Wash. State Physicians Ins. Exch. & Ass'n v. Fisons Corp.*, 122 Wn.2d 299, 339, 858 P.2d 1054 (1993). Here, the trial court abused its discretion in sentencing with the erroneous view that Mr. Brown had to be sentenced at the seriousness level of 3. The opposite is true.

¶57 We therefore remand for resentencing under the proper range.

¶58 The conviction is affirmed but the case is remanded for resentencing.

KULIK, A.C.J., and KORSMO, J., concur.

Review denied at 165 Wn.2d 1014 (2009).